Dr. No. 5, 13-0156 W.C. Sandy Hicks Appellant, Workers' Compensation Commission, Walmart, Appalooza May it please the Court, Counsel, good afternoon. My name is Nate Lancer and I represent Appellant Sandy Hicks. May I reserve five minutes for rebuttal? The reason why we're here today is whether or not the Workers' Compensation Commission's decision regarding Ms. Hicks' right shoulder is against the manifest way of the evidence. We, and I'm referring to myself and Ms. Hicks, believe that it is. The Commission found in favor of your application on the left shoulder, right? That's correct. But found against an accident on the right shoulder. That's correct. Okay. So our appeal is limited to just the right shoulder and the treatment that we were asking for. My brief contains an exhaustive and fair recitation of the facts, 22 pages. I'm not going to restate this here. So I will move on to the issues. And the issues, the first larger issue involves the Commission's decision on notice, accident, and causation. Ms. Hicks testified, she told Assistant Manager Cindy on February 14th of 2009 about pain in both shoulders. But her left shoulder pain was worse, and that's the non-disputed claim. Ms. Hicks knew it needed to be treated first. So they completed a brief statement. Cindy was not called by the respondent to rebut Ms. Hicks' testimony. Walmart did not produce a copy of this brief statement. And Ms. Hicks provided a perfectly reasonable explanation for the lack of notation in the two documents that were produced, the associate incident log and the associate statement. And the reason for the omission of any mention of her right shoulder was her left shoulder hurt more. She knew it had to be looked at first. And she had already told Cindy about the injury to both shoulders. Well, that has some superficial appeal, but who's Dr. McIntosh? Dr. McIntosh is her treating physician. Her treating physician. Correct. Okay. So his notes of February 24th reveal the claimant reported only an injury to her left shoulder. McIntosh also testified the claimant did not report a right shoulder injury on the initial visit. And the next visit, March 17th, there was still no mention in any medical records that the claimant reported an injury to her right shoulder. So even though you're arguing, yes, it was more severe with regard to the other shoulder, all this time goes by. She never mentions it to her treating physician. Doesn't that sort of weigh against her? It does. But only in the sense that, and this is from my experience as a practitioner in workers' compensation and looking through hundreds of thousands of pages of medical records, orthopedists like Dr. McIntosh, somebody goes in with numerous complaints to various body parts, they tend to focus on the body part that is hurting the most, the one that is causing the most problems, the ones that they, or the body parts that they want to fix, believe they can't fix initially. And this is what Dr. McIntosh was... But that's not what Dr. McIntosh suggested was the mechanism of the injury to her right shoulder. He suggested the injury to her right shoulder was caused by her having relied on it more as a way of compensating for her left shoulder pain, which undercuts the notion that she actually hurt it on February the 14th. It does, and I think that's our stronger theory of recovery in this case, is overuse. The overuse of that limb based on the injury to her left shoulder. But that's not what she says. She says she injured it on February the 14th. It depends how we define it. You are correct. It can be looked at that way. I believe that I looked at it the way that she told me when I met with her, and we filed our claims. What do you do with the surveillance videos? All right. Very good question. We've got two. The first is her going to, well, actually shopping at this Walmart while she was off work. Nothing in that particular video, I believe, contradicts directly her testimony. It showed her lifting a five pound plastic tote from her shopping cart onto the conveyor. It showed her shutting the hatchback to her vehicle after she put the items that she had purchased in the back. None of those activities were ones that were, I guess, prohibited by Dr. McIntosh. The second video was one of when she returned to work pursuant to the opinion of the IME Section 12 examiner, Dr. Lehman, who said you've got nothing wrong with your shoulder. You can go back to work full duty. And she was off work at that period of time by Dr. McIntosh. She came to me and I said, well, try it. Try to go back. Give it a shot. She did. And while performing her job duties that day, or that evening, excuse me, and doing activities such as lifting a heavy steel door and unpacking boxes and carrying items around the store, she suffered an aggravation of her shoulder. She immediately told a supervisor about it and immediately went to the emergency room after that. Now, there is discussion in Pelley's brief about her testimony, it being inconsistent in that video, that she grabbed her right shoulder immediately after injuring it on that day. The quality of the video, and I've been through every single second of it, poor quality, grainy from quite a distance away. It's not at the vantage point. And she is not seen the entire time. She's walking up and down aisles, which is out of the view of the camera. So I don't think that anything in those videos is directly in contradiction. It doesn't show her using her right arm to lift a big metal door to go outside? It shows her using both arms. And also, when she came back inside, the door had shut. She only got it about, oh, chest high. Remember, she's five feet tall. And she had to have a co-worker help her lift it up so she could pull the cart in. So you're saying the video really isn't dispositive either way? That's correct. And I don't believe it's inconsistent, or directly inconsistent with her testimony. Are all of these surveillance videos on the record? Yes, they are. Going back to why with regard to notice, I provide reasonable explanations as to why there's an omission. But if we were to use the overuse theory of recovery, which Dr. McIntosh was advocating, it doesn't matter. Notice doesn't matter with regard to the right shoulder because she already provided proper notice with regard to her left shoulder. But shortly, it wasn't until early April. Commission never reached notice, did they? Yeah, did they ever? Commission never reached notice. They never reached notice? Only because. They affirmed it on no causation. That's correct. And then said we won't address notice at all, so there's nothing to address. Well, then I will discuss causation. The Commission makes issue with Dr. McIntosh stating that when she was under restrictions for her left shoulder and she was back to work for Walmart, she was working as a people breeder, which meant that she had to push carts and carry items to the return desk that customers were bringing in. He testified, though, that he didn't need to know what her job duties were during that period of time, which was March and April of 2009. He didn't need to know what her activities of daily living were because, in his opinion, the natural overuse of her right arm due to the restrictions on her left arm caused an aggravation of her right arm. And so he wasn't concerned about the specifics, but he was more concerned about the relative increase in the use of that arm and, of course, that and the aggravation of it. So that is how that injury, the right arm injury, relates back to February 14, 2009 and overcomes any omission in notice, which, of course, the Commission did not address. But there's also the re-injury. When she attempted to return to work on May 4, 2011, as I discussed earlier, when she was instructed to, or at least an opinion given that she ought to return by Dr. Lehman, that she injured her right shoulder again and she heard a pop in that shoulder. And Dr. McIntosh testified that that event by itself could have been enough to require the need for the third shoulder surgery that he was recommending and for the MRI that he was recommending. Can I ask a question? Yes. You've got this aggravation that McIntosh notes in April of 2009 because of overcompensation. You have another injury you claim in May, the fourth. What did the application of adjustment of claim ask for? They asked for an injury that occurred in February. Did you ever file another application for adjustment of claim for an injury that took place in May? Yes. All right. And what happened there? They found no causation because Lynn testified that she never saw her exhibit any pain and saw her walking down the aisle swinging her arms. This is after her alleged injury. In May. In May. In May. All right. I think the video clearly shows that immediately after Ms. Hicks suffered that injury, within a few minutes she was telling a supervisor and then she quickly left and went to the emergency room after she had filled out an incident report. When was she swinging her arms as she was going up and down the aisles? Possibly before. In the video. Possibly before. And, again, the vantage point of the video is, like I mentioned earlier, it's inconclusive, I think, or substantial, but that's what it shows. But if I could turn to the Section 12 examiner, Dr. Lehman, the commission should not have found Dr. Lehman to be more persuasive than Dr. McIntosh. And it goes without saying, but I'm going to say it anyway, Dr. Lehman's opinions differ from treating physicians on most issues most of the time. It's virtually automatic. Well, that's why he's an I.M.E., isn't it? Well, that's why he's paid. He's an I.M.E. He could be a higher gun. But, you know, excuse me. I mean, it happens on both sides. It must be reasonable. That is correct. It does. But there were some things that he didn't do during his exam that I got him to admit to on the cross. He didn't ask her what he could or couldn't pick up. And this is a Section 12 examiner trying to make a determination as to whether or not she ought to return to work. He didn't ask her to pick up any objects during the exam. What did he do? He formed an assumption, an opinion that was ultimately wrong, that she could return to work at full duty, but he put her back in harm's way and she re-injured her right arm. So it's because of all these reasons that we believe and maintain that the Commission got this decision wrong on causation and that she ought to be entitled to payment of medical bills, temporary total disability, and prospective third shoulder surgery as recommended by Dr. McIntosh. And I also want to remind the Court that it wasn't until we sought this third shoulder surgery that any of this became an issue. Walmart had paid for temporary total disability benefits, they had paid for medical bills, they had paid for two shoulder surgeries for the right shoulder, and it wasn't until we sought the third that all this started to come out. So I... Can I ask you one question? If a person is injured in February and as a result of that injury they overly compensate and start to develop symptoms in another portion of the body, when you file an application for adjustment claim, what do you list as the date of injury? The original injury in February or when the overcompensation takes place? I believe it's the original date of injury in February. Because that's the source. That's correct, Your Honor. And also in April of 2009 when she began to experience more severe right shoulder pain and received an injection to that shoulder by Dr. McIntosh, she did inform Walmart that she was having increased right shoulder pain and that she had just received an injection. Thank you. Thank you, counsel. Counsel, you may respond. Good afternoon, Your Honors. May it please this honorable court, counsel. My name is Ian White and I represent the respondents in this claim, Walmart Associates. There are four major categories of reasons and evidence behind why the commission found that a plaintiff's condition of ill-being in her right shoulder is not causally related to the work injury of February 14, 2009. These categories include inconsistencies and contradictions regarding the timing and onset of plaintiff's right shoulder complaints, inconsistencies and contradictions regarding petitioner's testimony regarding the work activities she performed after the work accident of February 14, 2009, inconsistencies and contradictions regarding petitioner's testimony regarding her physical abilities prior to the arbitration hearing, and the fourth category behind the commission's decision was the expert testimony provided by petitioner's treating doctor, Dr. McIntosh, and respondent's independent medical examiner, Dr. Lane. Well, it's not in the forefront of the issues here. It certainly should be before your consideration that the arbitrator in the findings of fact did make a finding of fraud in this claim. And likely that was related to the long list of inconsistencies and contradictions that I'll walk through here. And in a lot of these questions, and I think why the arbitrator, the commission, the circuit courts all found and reached the same conclusion, there is a theme of lack of credibility here. But nonetheless, I'd like to dive into what these credibilities and inconsistencies are. The first area of inconsistencies and contradictions relates to the timing of the onset of the right shoulder pain. Petitioner had testified that her right shoulder was hurting one month before the work accident of February 14, 2009, that she injured her right shoulder again on February 14, 2009, and that she injured her right shoulder again on May 4, 2011. The timing of the onset of petitioner's complaints is inconsistent and contradicted by the evidence. First, there's an accident log, an associate incident log,  and petitioner provided notice to an overnight assistant manager, Kristen Wright. And Ms. Wright filled out the form, petitioner signed it, and there's no mention of any left shoulder, no, there is left shoulder mention, but there's no mention of right shoulder complaints. The next day, petitioner fills out an associate statement, and she completes that with another supervisor, Lynn Holder, and there's no mention of right shoulder injury again, and Ms. Holder testified that she didn't mention the right shoulder being injured or hurt, and if she had, then it would have been included in the associate statement. Then, as we discussed here, there have been earlier arguments about the timing of the medical treatment. It wasn't until April that anything showed up, right? Exactly. And also then with regard to the May 4, 2011 accident, petitioner testified she was loading machines onto a shelf when she experienced severe right pain in her shoulder causing her to grab for her right shoulder. The video surveillance does not show, well, it does show her dropping the box, it does not show her reaching and grabbing in pain for her right arm as she testified to it. Yet another inconsistency. Then the second category of evidence relates to the inconsistencies and contradictions regarding the petitioner's testimony of job duties performed after the February 14, 2011 incident. Petitioner initially testified that from February 4 to April 9, she was working as an apparel processor, which is true up until March 2 of 2009 when she was provided with a bona fide job offer to be a people breeder. And it wasn't until cross-examination that she admitted, yes, okay, I was put on light duty by Dr. McIntosh and Andreson, and oh, you're correct, I wasn't working as an apparel processor the whole time. I did move to a people processor, or a people breeder. And so that just was a complete contradiction of what she initially testified to as to what she was doing after the February 14, 2009 accident, which is relevant towards what were her activities after she had the initial incident that may have caused some sort of over-confrontation. Then the third category of evidence relied upon by the commission was inconsistencies and contradictions regarding petitioner's testified to physical abilities prior to the arbitration hearing. We talked about the video surveillance a little earlier and some more significance of what the video surveillance showed. Petitioner testified that she relied upon a sling any time she left her house from November 10, 2010 to February 2011, and also that she was unable to lift her right arm above her head during this time period. But video surveillance from the store on January 12, 2011 and January 14, 2011 depicts her in the store shopping, using her right arm to shop for items and place them in her cart. It shows her lifting a box above her neck with her right arm and placing them in a shopping cart. We discussed the heavy steel door where she was using both arms, but one of the arms was going above her head, which she testified she couldn't do. And then we also see her reaching above her head to close a tailgate to her SUV after shopping. And then none of the footage is plaintiff wearing the sling that she alleged, that she relied upon when leaving the house. Then the fourth category of evidence does relate to the expert testimony provided. Dr. McIntosh had a minimal understanding of Petitioner's specific activities performed. He testified that he did not know any specific activities she performed, the size of the pallets she allegedly lifted, the size of the loads on the pallets, how much or how often she performed repetitive activities, and how long the shifts were. He also testified that her shoulder tendinitis could be caused by her age and degenerative condition in the right shoulder. And also, clearly, Dr. McIntosh's understanding of the onset of Petitioner's complaints is inconsistent with what Petitioner testified the onset of her complaints were. And so for those reasons, his opinion was incomplete, and lacked a lot of substance behind what Petitioner was actually doing in the state of her condition at the onset of her symptoms. So all of that evidence leads you to the conclusion that the Commission's decision is not against the manifesto of the evidence, is that what you're saying? That's correct, Your Honors. There is a significant amount. There is sufficient factual evidence that it was not against the manifesto's way of the evidence, and there's just a significant amount of evidence that all the arbitrator, the Commission, the Circuit Court, all these judges have ruled accurately in assessing this claim. I noticed in this particular decision of the arbitrator something that I've never seen before. Now, many decisions say that a party lacks credibility. This is the first time I've ever seen an arbitrator write that a Petitioner was guilty of fraud. What prompted that? Who drafted this? I did not try the arbitration hearing, so it would have been a co-counsel of mine who was moved along. I tried the case at the Commission level. I believe this was a very long claim. There was lots of turns along the way where we find out about the job consistency, that the job duties weren't what they say they were, that there was an onset of the other inconsistencies. So it was significant. The arbitrator, I believe, felt strongly after this case. I wasn't there for the case in the trial, but the arbitrator was, and he did feel very strongly in his ruling. The Commission does not address that finding specifically, but they do affirm that decision. So it is, I believe, part of the Commission's decision as well. And so, Your Honor, based on those four categories that I discussed previously, there is much evidence in support that the Commission got this decision right. And I do not, the Respondent does not believe that it is getting it right this way yet. Thank you, Your Honor. Counsel, you may reply. I don't want to take up too much more of your time this afternoon. But with regard to the mention of fraud, Justice Hoffman asked where did the language come from. I believe it came from this. It was Arbitrator Tobin simply rubber stamping the Respondent's proposed decision, Walmart's proposed decision. I believe the language came from Zealous Advocate, counsel before Counsel White here. So I just believe it was Zealous Advocate. I don't think it amounted to malice or deceit on the part of Ms. Hicks. She didn't intend to deceive anyone. She tries her very best on cross-examination, redirect examination during her testimony to correct herself. She admits when she made a mistake in remembering things. She's punished by the Commission and by the Arbitrator in this decision, the allegation of fraud, for just being a poor historian. Please remember that this occurred back in 2009, a hearing we didn't have until many years later. She's not going to be able to remember every single aspect of her job duties. However, when confronted with additional information or a refresher of her recollection, she did adopt. She did change and say, okay, I was mistaken about that. That's the more accurate fact. With regard to the sling, she testified on a redirect that she didn't wear it all the time when she went to the office. She wasn't required to wear it all the time when she left the house. That's why she wasn't wearing it when she went shopping at Wal-Mart, while her restrictions were not being accommodated by Wal-Mart. And with regard to her restrictions and statements regarding the use of her shoulder and that arm, I maintain that it's just an innocent overstatement of her inability. On redirect, she did say, I am able to perform ordinary activities, driving a car, eating a bowl of soup. With that, are there any additional questions? Thank you, Counsel Boles. This matter will be taken under advisement. A written disposition shall issue.